## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

———————————————————————— x

A.F. OF L. AGC BUILDING TRADES : Civil Action No. _____
WELFARE PLAN and SHEET METAL :
WORKERS LOCAL 441 HEALTH & WELFARE :
PLAN on behalf of themselves and all others :
similarly situated, :
:
     Plaintiffs, : **CLASS ACTION COMPLAINT**
:
 vs. :
:
: **JURY TRIAL DEMANDED**
ASTRAZENECA PHARMACEUTICALS LP, :
ASTRAZENECA LP, ASTRAZENECA AB, and :
AKTIEBOLAGET HASSLE, :
:
     Defendants. :
:
————————————————————————x

   Plaintiffs, on behalf of themselves and the class defined below, by and through their

attorneys, for their Class Action Complaint allege the claims set forth herein against Defendants

AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca AB, and Aktiebolaget Hassle.

(collectively "Astra" or "Defendants"). Plaintiffs' claims as to themselves and their own actions,

as set forth in paragraphs 12 and 13, are based upon their own personal knowledge. All other

allegations are based upon information and belief pursuant to the investigation of counsel.

## NATURE OF THE CASE

  1.  This antitrust class is brought by Plaintiffs, on behalf of certain of their respective

members and a proposed class of all persons, or assignees of such persons who indirectly

purchased Toprol-XL and its AB-rated generic equivalents from Defendants during the period

from May 6, 2003 until the effects of Defendants' anticompetitive conduct ceases. Plaintiffs

allege that Defendants have engaged in a scheme designed to unlawfully maintain their monopoly in the United States for the pharmaceutical drug sold under the brand name Toprol-XL and its AB-rated generic equivalents in order to charge supracompetitive prices.

2.    Defendants market metoprolol succinate products under the brand name Toprol-XL.  Toprol-XL is an extended-release drug approved by the U.S. Food & Drug Administration ("FDA") for treating hypertension, angina, and congestive heart failure (together, herein referred to as "heart disease").  Toprol-XL is sold by Astra in 25 mg, 50 mg, 100 mg, and 200 mg dosages.  Astra reported 2005 U.S. sales of Toprol-XL of $1.29 billion, making it number one in revenue for betablockers.

3.    Defendants' scheme involved the commission of fraud and/or inequitable conduct before the United States Patent and Trademark Office ("PTO") in order to obtain two patents – U.S. Patent No. 5,001,161 (the " '161 patent") and U.S. Patent No. 5,081,154 (the " '154 patent") (collectively, the "Patents") – which, in the absence of such conduct, would not have been issued.  Defendants thereafter proceeded to improperly list the Patents in the FDA Approved Drugs Products With Therapeutic Equivalence Evaluations ("Orange Book").  Once the patents were listed in the Orange Book, Defendants commenced legal proceedings designed to block market entry by potential competitors seeking FDA approval to manufacture, market or sell a competing generic version of Toprol-XL.

4.    In May and August of 2003 and February and April of 2004, Defendants instituted litigation against companies seeking approval from the FDA to market generic forms of Toprol-XL, even though Defendants knew that their Patents had been improperly procured, and were invalid and/or unenforceable.  Defendants instituted these suits to frustrate or delay generic entry.  The commencement of these actions prevented the FDA from granting final

approval of a generic manufacturer's Abbreviated New Drug Application ("ANDA") to manufacture, market and sell a generic version of Toprol-XL under the "Hatch-Waxman Act." Drug Price Competition and Patent Term Restoration Act of 1984; *See* Pub.L. No. 98-417, 98 Stat.1585 (1984 (codified as amended at 21 U.S.C. § 355 and 35.U.S.C. § 271(e)))

5.      The Hatch-Waxman Act was designed to get generic drugs into the hands of consumers fast, but Defendants have used this Act to frustrate generic competition and prevent consumers from having access to a less expensive, reasonably priced alternative.

6.      Defendants knew that under the Hatch-Waxman Act the mere filing of patent litigation would automatically prevent the FDA, for up to thirty months, from granting final approval to a generic competitor who filed an ANDA, even though the Patents were fraudulently obtained and their patent infringement suits were objectively baseless.  Defendants' patents were ultimately found to be invalid and unenforceable in Federal District Court, but were nevertheless able to block generic competition for an extended period of time.  This allowed Defendants to unlawfully maintain their monopoly simply by listing the Patents in the Orange Book and then filing and pursuing baseless patent infringement litigation against generic competitors.

7.      By their unlawful acts, Defendants have willfully and unlawfully maintained their monopoly power over Toprol-XL and its AB-rated generic equivalents.  Absent Defendants' unlawful conduct, less expensive, bioequivalent generic versions of Toprol-XL would have been on the market much earlier.

8.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been denied the benefits of free and unrestrained competition. Plaintiffs and members of the Class have been denied the opportunity to choose between branded Toprol-XL and a lower priced AB-rated generic alternative which would have initially cost thirty

percent (30%) to forty percent (40%) less than branded Toprol-XL. Instead, Plaintiffs and members of the Class have been forced to continue to pay supracompetitive prices for Toprol-XL, thereby causing them to sustain injury to their business and property.

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 for equitable relief to remedy Defendants' violation of the federal antitrust laws.

10.     This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 26. This action also arises under the indirect purchaser laws defined herein as well as the common law of the fifty states of the United States and the District of Columbia. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. § § 15(a) and/or 22 because one or more Defendants is headquartered in this district. Venue is also proper as one or more Defendants transacts business in this district and/or committed an illegal or tortious act in this District.

## PARTIES

12.     Plaintiff A.F. of L. - A.G.C. Building Trades Welfare Plan (the "AFL Plan") is a welfare benefit plan with its principal place of business in Mobile, Alabama. The AFL Plan represents participants who have family coverage and purchased or paid for Toprol-XL. Defendants' unlawful conduct as alleged herein has caused the AFL Plan to be injured and will likely cause the AFL Plan to sustain injury if the conduct is allowed to proceed.

13.    Plaintiff Sheet Metal Workers Local 441 Health & Welfare Plan (the "Sheet Metal Workers Plan") is a welfare benefit plan with its principal place of business in Mobile, Alabama.  The Sheet Metal Workers Plan represents participants who have family coverage and purchased or paid for Toprol-XL.  Defendants' unlawful conduct as alleged herein has caused the Sheet Metal Workers Plan to be injured and will likely cause the Sheet Metal Workers to sustain injury if the conduct is allowed to proceed.

14.    Defendant AstraZeneca Pharmaceuticals LP is a company organized and existing under the laws of Delaware, which distributes, markets, sells, and/or profits from pharmaceutical products including Toprol-XL throughout the United States.  Its U.S. corporate headquarters is located at 1800 Concord Pike, Wilmington, DE.  AstraZeneca Pharmaceuticals LP is a U.S. subsidiary of AstraZeneca PLC, and was created as a result of the union of Zeneca Pharmaceuticals and Astra Pharmaceuticals LP in the U.S. after the 1999 merger.

15.    Defendant AstraZeneca LP is a Delaware corporation with its principal place of business in Wilmington, Delaware.  AstraZeneca LP holds an approved New Drug Application from the United States Food and Drug Administration ("FDA") for metoprolol succinate preparations with extended release, which it sells under the brand name Toprol-XL.  AstraZeneca LP is a U.S. subsidiary of AstraZeneca PLC.

16.    Defendant AstraZeneca AB is a company organized and existing under the laws of Sweden, having its principal place of business at S 151 85 Sodertalje, Sweden.

17.    Defendant Aktiebolaget Hassle is a company organized and existing under the laws of Sweden, having its principal place of business at Molndal, Sweden.  Aktiebolaget Hassle is a wholly owned subsidiary of AstraZeneca AB.

## CLASS ALLEGATIONS

18.    Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure,

on behalf of themselves and the following class:

> All persons and entities in the United States who indirectly
> purchased Toprol-XL at any time from May 6, 2003 and
> continuing until the effects of Defendants' anticompetitive conduct
> ceases (the "Class Period"). Excluded from the class are
> Defendants and their parents, employees, subsidiaries, and
> affiliates. For purposes of the Class definition, persons and entities
> "purchased" Toprol-XL if they paid some or all of the purchase
> price.

19.    The Class is so numerous that joinder of all members is impracticable.  Plaintiffs

believe that the Class numbers in the thousands.

20.    There are questions of law or fact common to the Class, including:

    a.    whether Defendants willfully obtained and/or maintained monopoly power
          over Toprol-XL and its generic equivalents;

    b.    whether Defendants' patents were obtained through fraud and/or
          inequitable conduct;

    c.    whether Defendants' suits asserting infringement of the Patents were
          objectively baseless; and

    d.    whether Defendants' conduct caused indirect purchasers of Toprol-XL to
          be overcharged and, therefore, injured.

21.    These and other questions of law and fact are common to the members of Class

and predominate over any questions affecting only individual members.

22.    Plaintiffs' claims are typical of the claims of the Class because all Class members

suffered injury in the same way as a result of Defendants' wrongdoing, and the claims of each

Class member arise out of the same nucleus of operative facts and are based on the same legal

theories.

23.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel experienced in class action and pharmaceutical antitrust litigation, and Plaintiffs have no interest in this litigation that is adverse to, or in conflict with, the interests of the other members of the Class.

24.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty that will be encountered in the management of the claims advanced by the Class that would preclude class certification.

## BACKGROUND

### Federal Regulation of Prescription Drugs

25.     The manufacture, marketing, distribution and sale of prescription drugs is one of the most profitable industries in the United States. In 2001, sales of prescription drugs dispensed in the United States were approximately $153 billion. In 2004, Toprol-XL worldwide sales were approximately $2 billion.

### A.     Federal Approval Of Pioneer Drugs

26.     Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the Act"), approval by the FDA is required before a company may begin selling a new drug. Pre-market approval for a new drug, often referred to as a "pioneer" or "branded" drug, must be sought by filing a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and effective for its intended use. New drugs that are approved for sale in the United States by the FDA are typically (but not necessarily) covered by patents, which provide the patent owner with the exclusive right to sell that new or pioneer drug in the United States for the duration of the patents involved, plus any extension of the original patent period (the "FDA Exclusivity Period") granted pursuant to the Hatch-Waxman Act.

27.    In addition to information on safety and efficacy, NDA applicants must submit to the FDA a list of all patents that claim the drug for which FDA approval is being sought, or that claim a method of using that drug, and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug.

28.    Once the NDA is approved, the FDA lists any patents referenced as part of the NDA application process in the Orange Book, where it can be easily found and consulted by future FDA applicants.

29.    Pursuant to 21 U.S.C. § 355(c)(2), if, after its NDA is approved, the pioneer drug manufacturer obtains a new patent that claims the drug or methods of its use, the company must supplement its NDA by submitting information on the new patent within thirty days of issuance. The FDA then lists the new patent in a supplement to the Orange Book.  The FDA is required to accept as true the patent information it obtains from patent holders, and to withhold its approval of a subsequent drug application, whenever the patent holder presents a litigated dispute (baseless or not) regarding the validity or infringement of the patent.  If an unscrupulous patent holder provides false information to the FDA or files frivolous patent infringement actions to delay the onset of generic competition, the FDA is powerless to stop it.

30.    Once the safety and effectiveness of a new drug is approved by the FDA, it may be used in the United States only under the direction and care of a physician who writes a prescription, specifying the drug by name, which must be dispensed by a licensed pharmacist. The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician, unless an AB-rated generic version of that pioneer drug that has been approved by the FDA is available.

**B.**    **Generic Drug Entry**

31.    Generic drugs are drugs that the FDA has found to be bioequivalent to brand name drugs, *i.e.*, generic drugs have the same active chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs. Where a generic drug is completely equivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an "AB" rating.

32.    Generic drugs are invariably priced below the branded drugs to which they are bioequivalent. The first generic competitor to enter a market typically does so at a price at least thirty percent (30%) lower than the price of the equivalent brand-name drug and quickly takes a substantial amount of market share away from the brand-name manufacturer. As additional generic competitors come to market, the price of the generic equivalents continues to fall, and their combined market share continues to grow. In some cases, generic competitors sell products equivalent to brand-name prescription drugs for as little as fifteen percent (15%) of the price of the brand-name drug, and have captured as much as ninety percent (90%) of the brand-name drug's pre-generic sales. Unless the branded manufacturer lowers prices to meet competition, a branded drug loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition.

33.    If a generic version of a brand-name drug exists and the physician has not specifically indicated on the prescription "DAW" or "dispense as written" (or similar indications, the wording of which varies slightly from state to state), then: (a) for consumers covered by most insurance plans, the pharmacist will substitute the generic drug; and (b) for consumers whose purchases are not covered by insurance plans, the pharmacist will offer the consumer the choice of purchasing either the branded drug, or the AB-rated generic at a lower price.

34.     Once a physician writes a prescription for a brand-name drug such as Toprol-XL, that prescription defines and limits the market to the drug named or its AB-rated generic equivalent. Only drugs that carry the FDA's AB generic rating may be substituted by a pharmacist for a physician's prescription for a brand-name drug.

35.     The price competition engendered by generic drug manufacturers benefits all purchasers of the drug, who are able to buy the same chemical substance at much lower prices. Many health insurance companies and employee benefit plans encourage or require substitution of generic drugs for brand-name drugs in order to lower health care costs. Retail pharmacies routinely substitute generic drugs for brand-name drugs whenever possible in order to lower their own costs and the costs of their customers.

### C.      Abbreviated New Drug Applications For Generic Drugs

36.     Congress enacted the Hatch-Waxman Act in 1984 to establish an abbreviated process to expedite and facilitate the development, approval and marketing of generic drugs. To effectuate its purpose, the Hatch-Waxman Act permits a generic drug manufacturer to file an ANDA, which incorporates by reference the safety and effectiveness data developed and previously submitted to the FDA by the company that manufactured the original, "pioneer" drug. The Act also provides an economic incentive to the manufacturer of the first generic drug to file an ANDA for a particular generic drug – *i.e.*, a 180-day statutory period of market exclusivity, during which time the manufacturer has the right to market its drug free from other generic competition.

37.     The most important new information that must be included in the ANDA concerns the generic company's position *vis-à-vis* the patent that the pioneer manufacturer

claims applies to the drug. Therefore, the ANDA filer must make one of four certifications to the FDA:

> I.    that no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");
>
> II.    that the patent (or patents) for the pioneer drug has (or have) expired (a "Paragraph II Certification");
>
> III.    that the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or
>
> IV.    that the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii). In the case of a patent that has not yet expired, the ANDA applicant's only certification options are Paragraph III or IV certifications. *See id.* If the generic manufacturer makes a Paragraph IV Certification, the ANDA applicant must notify the patent owner of the filing and explain why the patent is invalid or will not be infringed. *See* 21 U.S.C. § 355(j)(2)(A)(vi)(IV).

38.    The patent owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has a 45-day statutory period in which to initiate a patent infringement suit against the applicant. *See* 21 U.S.C. § 355(j)(5)(B)(iii). If no action is initiated within 45 days, FDA approval of the generic product is not delayed by patent issues. However, if a patent infringement suit is brought within the 45-day window, FDA approval of the generic drug is automatically postponed until the earliest of: (i) the expiration of the patent; (ii) thirty months

from the patent holder's receipt of the Paragraph IV Certification (30-month stay); or (iii) a final

judicial determination of invalidity or non-infringement from which no appeal can be or has been

taken. *Id.*; 21 C.F.R. § 314.107.

39.    At all times relevant herein, under 21 U.S.C. § 355(j)(5)(B)(iv), the first applicant

to submit an acceptable ANDA with a Paragraph IV Certification for a generic version of a

brand-name drug receives a 180-day period of exclusivity before other ANDAs for the same

drug can be approved by the FDA.  The 180-day exclusivity period begins when the first ANDA

applicant either (a) begins selling the generic drug or (b) obtains a final judgment of non-

infringement in a patent infringement action, whichever occurs first.  Thus, the first generic

ANDA applicant has the opportunity to compete directly with the brand-name manufacturer for

180 days without competition from other generic manufacturers.  If, however, the patent holder

is able to forestall the events which trigger the start of the 180-day period of exclusivity, it can

delay indefinitely the entry of all generic competitors.

**D.    Toprol-XL -Generic Competition**

40.    Defendants have successfully forestalled generic competition to Toprol-XL from

entering the market – thereby delaying purchasers the benefits of cheaper, generic extended-

release metoprolol succinate products – by obtaining patents improperly through intentional

misrepresentations and omissions, fraudulently listing these patents in the Orange Book, and

bringing and maintaining sham patent infringement suits based on these patents.

**1.    Defendants' Fraudulent Procurement of Patents**

41.    Defendants contend two patents cover Toprol-XL and bar generic competition:

U.S. Patent No. 5,001,161 (the " '161 patent") and U.S. Patent No. 5,081,154 (the " '154

patent") (collectively, the "Patents"):

42.     The '161 patent issued on March 19, 1991, with a single claim: "A pharmaceutical composition comprising metoprolol succinate together with a sustained release pharmaceutically acceptable carrier."

43.     The '154 patent issued on January 14, 1992, with a single claim: "Metoprolol succinate." The named inventors on both the '161 and '154 patents are Curt H. Appelgren and Eva C. Eskilson.

44.     Appelgren and Eskilson, however, were not the inventors of metoprolol succinate. Metoprolol succinate was first made at Astra before either of them joined the company and more than ten years before the patent applications claiming the compound were filed before the PTO.

45.     In the early 1980s, Appelgren and Eskilson were employed by Astra's AB Hassle division in Molndal, Sweden. While Appelgren and Eskilson participated in a project to develop new controlled release formulations of metoprolol, their duties had nothing to do with the identification, synthesis, or invention of different salts of metoprolol.

46.     At the time, responsibility for synthesis of alternative compounds at Astra rested with a group employed by Astra Pharmaceutical Production AB, located in Sodertalje, Sweden. Appelgren or Eskilson did not, therefore, conceive of synthesized metoprolol succinate. Rather, that compound was supplied to the group of which Appelgren and Eskilson were members by chemists employed by Astra in Sodertalje, including Lars Lilljequist.

47.     During Astra's patent litigation against potential generic competitors, Appelgren testified that metoprolol succinate was not a newly developed product at Astra, but was an "old" compound supplied to the product development group. During her deposition in the patent litigation, Ms. Eskilson could not recall why she was named an inventor of metoprolol succinate.

48.     Appelgren resigned from Hassle in 1982 to form his own company, Lejus

Medical AB ("Lejus").  Appelgren was a founder and twenty-five (25%) owner of Lejus.

Eskilson later joined Appelgren at Lejus, and Appelgren and Eskilson began to work on

developing a sustained release formulation of quinidine sulphate for a U.S. company unrelated to

Astra.

49.     On January 10, 1984, Lejus filed a Swedish patent application (SE8400085, the

"Swedish Application") naming Appelgren and Eskilson as the inventors based on the sustained

release formulation they had developed for quinidine sulphate at Lejus.  When listing potentially

useful pharmaceutical agents for their sustained release formulation, Appelgren and Eskilson

included metoprolol succinate.  Appelgren and Eskilson listed metoprolol succinate because they

did not believe they were violating any duty of confidentiality by disclosing it in the Swedish

Application.  Appelgren and Eskilson tried to claim formulations of metoprolol succinate after

leaving the employ of Astra.

50.     The Lejus application was published in July, 1985.  The application came to the

attention of Hassle and its parent, Astra AB, which on October 21, 1985.  Astra, thereafter,

contested their right and asserted its ownership to rights to metoprolol succinate in a complaint

filed in the Swedish Patent Office.  In the complaint, Astra alleged that metoprolol succinate had

been invented by its employee Toivo Nitenberg and disclosed in confidence to Appelgren and

Eskilson.   At this point, Lejus had already filed a corresponding U.S. patent application (U.S.

Serial No. 690,197 (the " '197 application"), which ultimately issued as U.S. Patent

No. 4,780,318 (the " '318 patent")).

51.     To settle the complaint, Lejus, Appelgren, and Eskilson agreed to assign Hassle

any rights to metoprolol succinate in an agreement dated April 21, 1986 (the "Lejus/Hassle

agreement"). The Lejus/Hassle agreement was negotiated on behalf of Hassle and Astra at least by employees of Astra's patent department, including Bengt Wurm.

52.     In March, 1988, Lejus filed the U.S. patent application (U.S. Serial No. 172,897, the " '897 application") that eventually issued as the '161 patent, tracking almost exactly the agreed-upon language from the Lejus/Hassle agreement. Thereafter, Lejus assigned this application to Hassle.

53.     By the time this application was filed in March of 1988, more than one year had passed since publication of Lejus's Swedish Application naming metoprolol succinate and claiming sustained-release pharmaceutical formulations containing metoprolol succinate. Thus, Hassle knew that unless the applications issuing as the '161 and '154 patents could rely on the filing date of the Swedish Application, any new claims in the '161 and '154 patents to metoprolol succinate or sustained-release formulations of it would be unpatentable, *inter alia*, as anticipated by the Swedish Application, pursuant to 35 U.S.C. §§ 102(b), 119(a). They would have been unpatentable as anticipated because of other prior art as well, including an article published in 1987 and two other patent applications filed by Hassle.

54.     Thus, Hassle knew that if it identified Nitenberg as the inventor of the '161 and '154 patents, then because Nitenberg is not inventor on the '897 application and the Swedish Application, that Hassle would not be able to rely on the filing date of the Swedish Application for the '161 and '154 patents and those patents would be rejected by the PTO or invalidated in litigation.

55.     Hassle knew that in order to obtain U.S. patents directed to metoprolol succinate and avoid the bar of the published Swedish Application, it had to file fraudulently in the names of Appelgren and Eskilson in order to make a (fraudulent) claim of priority. Hassle did just this.

56.    Appelgren, Eskilson, the representatives of Hassle and Astra, and others involved in the prosecution of the '161 and '154 patents knew that Appelgren and Eskilson were not the joint inventors of metoprolol succinate or the subject matter claimed in the patents.

57.    During the prosecution of the '161 and '154 patents, Defendants did not disclose to the PTO its complaint to the Swedish Patent Office dated October 21, 1985, the Lejus/Hassle agreement, the facts leading to these documents, or that Toivo Nitenberg had made metoprolol succinate in 1971.

58.    During the prosecution of the '161 and '154 patents, Defendants intentionally made other material misrepresentations and omissions, including in submitting a declaration of an employee, John Anders Sandberg (the "Sandberg Declaration").  Among other things although the Sandberg Declaration extols the virtue of metoprolol succinate for use in once-daily, controlled-release preparations, Defendants did not explain that its alleged virtues were unique to a particular formulation developed by Sandberg, unrelated to any work done by Appelgren and Eskilson.  The Sandberg Declaration also omits material information known to Dr. Sandberg and Defendants about prior art and the performance of other metoprolol salts.

59.    Because the facts and information that Defendants failed to disclose and/or misrepresented to the PTO directly relate to proper inventorship and derivation and would have precluded patentability under, at least, 35 U.S.C. § 102(f), they were of the highest materiality.

60.    These omissions and/or misrepresentations were purposeful.  They were made with an intent to deceive and did, in fact, deceive the PTO, resulting in the issuance of the '161 and '154 patents.

2.    **The Disclaimer**

61.    Claim 8 of Defendants' '318 patent, which issued on October 25, 1988 (expiring on October 25, 2005), claims, among other compounds, "metoprolol succinate."

62.    The claims of the '161 and '154 patents also claim "metoprolol succinate," but are due to expire on March 18, 2008, which is more than 17 years after the issuance of the '318 patent.

63.    Defendants knew that the Patent Act (as it existed when the '318 patent was filed) entitled them only to 17 years of patent protection for metoprolol succinate and that the Patent Act prohibited them from "double patenting" metoprolol succinate in order to obtain more than 17 years of patent protection.  However, Defendants did not file any terminal disclaimers limiting the patent monopoly for metoprolol succinate to 17 years.

64.    Because Plaintiffs did not file terminal disclaimers for the '161 and '154 patents, the patents are invalid for obviousness-type double patenting due to claim 8 of the '318 patent, and Defendants knew this.

65.    On November 21, 2003, Defendants filed a statutory disclaimer of claim 8 of the '318 patent, effectively canceling the claim. By filing the statutory disclaimer of claim 8 of the '318 patent, instead of filing terminal disclaimers of the '161 and '154 patents, Defendants wrongfully and in bad faith attempted to circumvent double-patenting invalidity of the '161 and '154 patents and obtain more than 17 years of patent protection for metoprolol succinate.

66.    Defendants' filing of the statutory disclaimer of claim 8 to overcome the obviousness type double patenting invalidity of the '161 and '154 patents is objectively baseless and was not done for any legitimate purpose.

### 3.    Defendants' Fraudulent Orange Book Listings

67.    Despite Defendants' knowledge that the '161 and '154 patents were invalid, the Defendants caused the patents to be listed in the Orange Book as covering Toprol-XL in order to claim infringement if generics attempted to manufacture Toprol-XL. Defendants did not withdraw the patents from the Orange Book even after being provided with clear proof that they were improperly filed.

68.    Defendants knew under the Hatch-Waxman Act that if they sued to enforce patents listed in the Orange Book, they would be able to delay FDA final approval of ANDAs filed by generic competitors, thereby barring generic entry for up to thirty (30) months.

### 4.    Defendants' Sham Litigations

69.    Knowing the '161 and '154 patents were invalid, Defendants commenced multiple patent-infringement suits against the following companies seeking to market generic, bioequivalent versions of Toprol-XL:  KV Pharmaceutical Co. ("KV"), Andrx Pharmaceutical, LLC and Andrx Corp. (collectively, "Andrx"), and Eon Labs, Inc. ("Eon") (collectively, the "generic manufacturers"). These litigations were transferred to the Eastern District of Missouri for pre-trial proceedings.

| AstraZeneca's Sham Litigations Against Generic Manufacturers | | | |
|---|---|---|---|
| **Generic Manufacturer** | **Date Filed** | **District** | **Case Number** |
| KV Pharmaceutical Co. | May 6, 2003<br>Aug. 22, 2003 | E.D. Missouri<br>E.D. Missouri | 4:03-cv-00592-RWS<br>4:03-cv-01169-RWS |
| Andrx Pharmaceuticals, LLC<br>Andrx Corporation | Feb. 5, 2004 | D. Delaware | 1:04-cv-00080-SLR |
| Eon Labs, Inc. | Apr. 5, 2004 | D. Delaware | 1:04-cv-00205-SLR |

a.    The KV Pharmaceutical Litigation

70.    In early 2003, KV submitted an ANDA containing a Paragraph IV Certification that the '161 and '154 patents were invalid and/or unenforceable to the FDA.

71.     In May 2003, Defendants filed a suit against KV for infringement of the '161 and '154 patents in the United States District Court for the Eastern District of Missouri. KV then asserted counterclaims for patent invalidity and non-infringement. Defendants proceeded with the baseless patent infringement litigation in order to invoke the thirty (30) month Hatch-Waxman stay.

72.     Throughout the course of the litigation, Defendants were fully aware that the '161 patent had been procured by fraud and was therefore unenforceable. Defendants also knew that the '161 and '154 patent were invalid because they constituted double patenting and were anticipated by prior art.

73.     Defendants' anticompetitive conduct had the effect of preventing generic versions of Toprol-XL from coming to market and consequently of illegally extending Defendants' monopoly on Toprol-XL while the litigation progressed.

        b.      The Andrx Litigation

74.     In late 2003 or early 2004, Andrx submitted an ANDA containing a Paragraph IV Certification that the '161 and '154 patents were invalid and/or unenforceable to the FDA.

75.     In February 2004, Defendants filed a suit against Andrx for infringement of the '161 and '154 patents in the United States District Court for the District of Delaware. Andrx then asserted counterclaims for patent invalidity and non-infringement. Defendants proceeded with the baseless patent infringement litigation in order to invoke the thirty (30) month Hatch-Waxman stay.

76.     Throughout the course of the litigation, Defendants were fully aware that the '161 patent had been procured by fraud and was therefore unenforceable. Defendants also knew that

the '161 and '154 patent were invalid because they constituted double patenting and were anticipated by prior art.

77.    Defendants' anticompetitive conduct had the effect of preventing generic versions of Toprol-XL from coming to market and consequently of illegally extending Defendants' monopoly on Toprol-XL while the litigation progressed.

      c.    The Eon Litigation

78.    In early 2004 Eon submitted an ANDA containing a Paragraph IV Certification that the '161 and '154 patents were invalid and/or unenforceable to the FDA.

79.    In April 2004 Defendants filed a suit against Eon for infringement of the '161 and '154 patents in the United States District Court for the District of Delaware. Eon then asserted counterclaims for patent invalidity and non-infringement. Defendants proceeded with the baseless patent infringement litigation in order to invoke the thirty (30) month Hatch-Waxman stay.

80.    Throughout the course of the litigation, Defendants were fully aware that the '161 patent had been procured by fraud and was therefore unenforceable. Defendants also knew that the '161 and '154 patent were invalid because they constituted double patenting and were anticipated by prior art.

81.    Defendants' anticompetitive conduct had the effect of preventing generic versions of Toprol-XL from coming to market and consequently of illegally extending Defendants' monopoly on Toprol-XL while the litigation progressed.

      d.    The MDL Litigation

82.    All of the patent infringement cases were consolidated in the Eastern District of Missouri. *In re Metoprolol Succinate Patent Litig.*, MDL Docket No. 1620 (E.D. Mo.)

83.    In a Memorandum and Order dated January 17, 2006, Judge Rodney W. Sippel of the District Court in Missouri granted summary judgment for the generic manufacturers, finding by clear and convincing evidence that (i) Defendants' '161 and '154 patents were invalid on the basis of double patenting over the '318 patent and that (ii) the '161 and '154 patents were unenforceable based on Defendants' inequitable conduct before the PTO in failing to disclose the dispute with Lejus over the identity of the inventors.

84.    Defendants litigations were objectively baseless and commenced and maintained in bad faith, with the specific intent and subjective motivation to prevent the generic manufacturers from selling competing metoprolol succinate products. The litigations were predicated upon deceptive conduct before the PTO, FDA and other such conduct, including during the patent infringement litigations. As Judge Sippel noted, during the litigation, Defendants "maintained a pattern of submitting witness declarations that contradict their own prior deposition testimony."

85.    Defendants knew they could not expect success on the merits of these litigations, but utilized the Hatch-Waxman process to bar the generic manufacturers from entering the market.

86.    In the January 17th Order Judge Sippel found that the inventorship issue was "highly material" to patentability and that Astra's intent to deceive was "clearly present." Defendants' lawsuits were shown to be a sham.

## EFFECTS ON COMPETITION

87.    Defendants' exclusionary conduct has delayed generic competition and unlawfully enabled Defendants to sell Toprol-XL without being subject to generic competition.

But for Defendants' illegal conduct, one or more competitors would have begun marketing an AB-rated generic version of Toprol-XL products much sooner.

88.     The generic manufacturers seeking to sell generic Toprol-XL have extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products.  Eon, for example, has a history of achieving high approval rates for its ANDAs.

89.     Eon has publicly affirmed its intention and ability to begin selling generic Toprol-XL upon approval of its ANDA.  However, Defendants' unlawful conduct has caused the ANDA approval process to be delayed by the FDA and caused the generic manufacturers to divert resources from their applications and to expend unnecessary resources on litigation.  Another potential generic manufacturer, Andrx, has recently had its pending drug applications placed on hold, which would not have affected its metoprolol succinate ANDA absent delay.

90.     If generic competitors had not been unlawfully prevented from entering the market and competing with Defendants, indirect purchasers, such as Plaintiffs, would have (a) substituted a lower-priced generic version instead of purchasing Toprol-XL, (b) paid less for some or all of their remaining Toprol-XL purchases, and/or (c) would have paid less for their generic purchases, and consequently would have paid in any event substantially less for extended-release metoprolol succinate products.

91.     Moreover, because of Defendants' fraudulent Orange Book listings, once the generic manufacturer that filed first for a particular dosage strength begins to sell its generic version of Toprol-XL, it will be entitled to 180-days of generic marketing exclusivity for that dosage strength, which will delay the entry of the generic competitors into the market and forestall further price competition.

92.     Defendants' unlawful conduct deprived Plaintiffs of the benefits of competition that the Hatch-Waxman Act and the antitrust laws were designed to ensure.

93.     Defendants have monopoly power over Toprol-XL and its generic equivalents, since they have had the power to maintain the price of Toprol-XL at supracompetitive levels without losing substantial sales. When generic competition arrives, Defendants will not be able to maintain their current prices of Toprol-XL without losing substantial sales.

89:     Defendants sold Toprol-XL at prices well in excess of marginal costs and enjoyed high profit margins. Defendants have had the power to exclude competition.

## INTERSTATE TRADE AND COMMERCE

94.     At all times relevant herein, Defendants manufactured and sold substantial amounts of Toprol-XL in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States as follows:

- Defendants transmitted funds as well as contracts, bills, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Toprol-XL ; and

- Defendants employed, in furtherance of their monopolization and attempt to monopolize, as alleged herein, the United States mails and interstate and international telephone lines as well as means of interstate and international travel.

95.     The illegal monopolization and attempt to monopolize the market for Toprol-XL as alleged herein have substantially affected interstate and foreign commerce.

**RELEVANT MARKET**

96.    The relevant product market is Toprol-XL  and its generic bioequivalents rated "AB" by the FDA.  The relevant geographic market is the United States.  Defendants currently hold a 100% share in the relevant product and geographic markets.  Accordingly, Plaintiffs and members of the Class continue to pay higher prices for their extended-release metoprolol succinate purchases than they would otherwise have paid, as a result of Defendants' unlawful and willful extension of their monopoly power through the conduct alleged herein

**COUNT I**

**For Declaratory and Injunctive Relief Under**
**Section 16 of the Clayton Act For Violations of Section 2 of the Sherman Act**

97.    Plaintiffs incorporate by reference the preceding allegations.

98.    Defendants knowingly and willfully engaged in a course of conduct designed to extend and maintain monopoly power.  This course of conduct included, *inter alia,* improperly obtaining the '161 and 154 patents by committing fraud and/or inequitable conduct before the PTO, improperly listing the '161 and '154 patents in the Orange Book, and improperly filing and prosecuting objectively baseless patent infringement litigations against companies seeking to enter the market with competing versions of Toprol-XL.

99.    Defendants' filing and prosecution of these actions was designed to delay the introduction of generic formulations of Toprol-XL into the market and was in violation of Section 2 of the Sherman Act.

100.    During the Class Period, Defendants possessed monopoly power in the relevant market.  Defendants intentionally and wrongfully maintained their monopoly power in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  While obtaining

and possessing its unlawful monopoly power over the market for Toprol-XL, Defendants set, maintained and raised the price of Toprol-XL to artificially high and/or supracompetitive levels.

101.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations.  Their injury consists of having paid and continuing to pay higher prices for Toprol-XL than they would have paid in the absence of those violations.  Such injury is of the type antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.  Plaintiffs and members of the Class are likely to purchase Toprol-XL in the future.  Injunctive relief is, therefore, appropriate under 15 U.S.C. § 26.

102.    Plaintiffs seek injunctive and declaratory relief to enjoin Defendants from engaging in future anticompetitive practices concerning the manufacture, distribution or sale of Toprol-XL.  Plaintiffs do not seek damages under Count I.

## COUNT II

### For Monopolization Under State Law

103.    Plaintiffs incorporate by reference the preceding allegations.

104.    As described above, Defendants knowingly and willfully engaged in a course of conduct designed to extend their monopoly power.

105.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Arizona Revised Stat. §§ 44-1401, *et seq.,* with respect to purchases of Toprol-XL in Arizona by members of the Class.

106.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Cal. Bus. &

Prof. Code §§ 17200, *et seq.* with respect to purchases of Toprol-XL in California by members of the Class.

107.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of D.C. Code Ann. §§ 28-45031, *et seq.*, with respect to purchases of Toprol-XL in the District of Columbia by members of the Class.

108.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Fla. Stat. §§ 501. Part II, *et seq.,* with respect to purchases of Toprol-XL in Florida by members of the Class.

109.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Iowa law with respect to purchases of Toprol-XL in Iowa by members of the Class.

110.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Toprol-XL in Kansas by members of the Class.

111.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of La. Rev. Stat. §§ 51:137, *et seq.*, with respect to purchases of Toprol-XL in Louisiana by members of the Class.

112.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of Toprol-XL in Maine by members of the Class.

113.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Mass. Ann. Laws ch. 93, *et seq.*, with respect to purchases of Toprol-XL in Massachusetts by members of the Class.

114.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Mich.CompLaws Ann. §§ 445.771, *et seq.*, with respect to purchases of Toprol-XL in Michigan by members of the Class.

115.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Minn. Stat. §§ 325D.52, *et seq.* with respect to purchases of Toprol-XL in Minnesota by members of the Class.

116.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of Toprol-XL in Mississippi by members of the Class.

117.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of Toprol-XL in Nebraska by members of the Class.

118.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Nev. Rev. Stat. Ann. § 598A., *et seq.*, with respect to purchases of Toprol-XL in Nevada by members of the Class.

119.    Defendants have intentionally and wrongfully maintained their  monopoly power in the relevant markets in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1 *et seq.*, with respect to purchases of Toprol-XL in New Jersey by members of the Class.

120.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of N.M. Stat. Ann. §§ 57-1-1 *et seq.*, with respect to purchases of Toprol-XL in New Mexico by members of the Class.

121.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of New York General Business Law § 340, *et seq.*, with respect to purchases of Toprol-XL in New York by members of the Class.

122.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Toprol-XL in North Carolina by members of the Class.

123.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of Toprol-XL in North Dakota by members of the Class.

124.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of Toprol-XL in South Dakota by members of the Class.

125.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Toprol-XL in Tennessee by members of the Class.

126.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases of Toprol-XL in Vermont by members of the Class.

127.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of W.Va. Code §§ 47-18-1, *et seq.,* with respect to purchases of Toprol-XL in West Virginia by members of the Class.

128.    Defendants have intentionally and wrongfully maintained their monopoly power in the relevant markets in violation of Wis. Stat. § 133.01, *et seq.*, with respect to purchases of Toprol-XL an in Wisconsin by members of the Class.

129.    Plaintiffs and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count.  Their injury consists of paying higher prices for Toprol-XL  prescription drugs than they would have paid in the absence of those violations.  This injury is of the type the antitrust and consumer protection laws of the above States and the District of Columbia were designed to prevent and flows from that which makes Defendants' conduct unlawful.

130.    Plaintiffs and the Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations of the aforementioned statutes.

## COUNT III

### For Unfair and Deceptive Trade Practices Under State Law

131.    Plaintiffs incorporate by reference the preceding allegations.

132.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below when they fraudulently filed for and obtained a patent for Toprol-XL and commenced baseless patent infringement actions against generic manufacturers in order to prevent the FDA from granting final approval of pending applications of would-be competitors to market generic Toprol-XL.   As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and class members were deprived of the opportunity to purchase a generic version of Toprol-XL during the class period and have been forced to pay higher prices for extended release motprolol succinate .

133.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*.

134.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq*.

135.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq*.

136.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*.

137.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. § 6-1-105, *et seq*.

138.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq*.

139.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq*.

140.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, *et seq*.

141.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq*.

142.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-392, *et seq*.

143.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq*.

144.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*

145.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*

146.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*

147.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq.*

148.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, *et seq.*

149.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*

150.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*

151.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*

152.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*

153.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*

154.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010, *et seq.*

155.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq*.

156.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*.

157.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq*.

158.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*.

159.    Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Rev. Stat. § 56:8-1, *et seq*.

160.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, *et seq*.

161.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349 *et seq*.

162.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq*.

163.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq*.

164.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq*.

165.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. 15 § 751, *et seq*.

166.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq*.

167.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq*.

168.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq*.

169.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq*.

170.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq*.

171.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq*.

172.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq*.

173.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq*.

174.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451, *et seq*.

175.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*.

176.    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq*.

177.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, *et seq*.

178.    Plaintiffs and members of the class members have been injured in their business and property by reason of Defendants' anticompetitive, unfair or deceptive acts alleged in this Count.  Their injury consists of paying higher prices for Toprol-XL prescription drugs than they would have paid in the absence of these violations.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## COUNT IV

### Unjust Enrichment

179.    Defendants have benefited from the monopoly profits on their sales of Toprol-XL resulting from the unlawful and inequitable acts alleged in this Complaint.

180.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Toprol-XL by Plaintiffs and members of the Class.

181.    Plaintiffs and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiffs and the Class.

182.    The economic benefit of overcharges and unlawful monopoly profits derived by Defendants through charging supra-competitive and artificially inflated prices for Toprol-XL is a direct and proximate result of Defendants' unlawful practices.

183.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Class, as Plaintiffs and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

184.    It would be inequitable for the Defendants to be permitted to retain any of the overcharges for Toprol-XL derived from Defendants' unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

185.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Class all unlawful or inequitable proceeds received by them.

186.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiffs and the Class.

187.    Plaintiffs and the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order:

A.      certifying the Class pursuant to the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

B.      declaring that Defendants' conduct to be in violation of § 2 of the Sherman Act;

C.      declaring the Defendants' conduct to be in violation of the antitrust and/or deceptive practice statutes in the Indirect Purchaser States;

D.      enjoining and restraining Defendants' continuing violations of § 2 of the Sherman Act, pursuant to § 16 of the Clayton Act;

E.      granting Plaintiffs and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a construction trust to remedy Defendants' unjust enrichment;

F.      granting Plaintiffs and the Class damages as permitted by law;

G.      granting Plaintiffs and the Class their costs of prosecuting this action, together with interest and reasonable attorneys' fees, experts' fees and costs; and

H.     granting such other relief as this Court may deem just and proper.


## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  February 8, 2006

**MILBERG WEISS BERSHAD**
**& SCHULMAN LLP**


By: /s/ Ralph N. Sianni (#4151)
Seth D. Rigrodsky (DSBA No. 3147)
Ralph N. Sianni (DSBA No. 4151)
919 North Market Street, Suite 980
Wilmington, Delaware 19801
Telephone:  (302) 984-0597
Facsimile:   (302) 984-0870

-and-

Michael M. Buchman
J. Douglas Richards
Ryan G. Kriger
**MILBERG WEISS BERSHAD**
**& SCHULMAN LLP**
One Pennsylvania Plaza
New York, NY  10119
Telephone:  (212) 594-5300
Facsimile:   (212) 868-1229

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

A.F. OF L. AGC BUILDING TRADE WELFARE PLAN and SHEET METAL WORKERS LOCAL 441 HEALTH & WELFARE PLAN on behalf of themselves and all others similarly situated.

**(b)** County of Residence of First Listed Plaintiff   **Mobile County, AL**
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA LP, ASTRAZENECA AB, and AKTIEBOLAGET HASSLE.

County of Residence of First Listed Defendant   **NEW CASTLE COUNTY, DE**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Ralph N. Sianni
Milberg Weiss Bershad & Schulman LLP
(DSBA #4151)   919 North Market St., Suite 980, Wilmington, DE  19801
Tel: (302) 984-0597

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** |  | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Section 16; 15 U.S.C. § 26; Sherman Act, Section 2; 15 U.S.C. § 2        Clayton Act,

Brief description of cause:   ANTITRUST

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE   Gregory M. Sleet        DOCKET NUMBER   1:06-cv-00052-GMS

DATE
February 8, 2006

SIGNATURE OF ATTORNEY OF RECORD
/s/ Ralph N. Sianni   (DSBA # 4151)

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____